IN THE TWELFTH JUDICIAL CIRCUIT, IN AND FOR SARASOTA COUNTY, FLORIDA

CASE NO.: 2012CA5349NC

ELIZABETH A. JOHNSON, and GORDY JOHNSON, her husband,

Plaintiffs

vs.

JOHNSON & JOHNSON, INC., and DEPUY ORTHOPEDICS, INC.,

Defendants.
_______________________________/

FILED FOR RECORD
2012 JUN 29 PM 1:14
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY, FL

**COMPLAINT**

Plaintiffs ELIZABETH JOHNSON and GORDY JOHNSON, her husband, by and through the undersigned attorney, sues the Defendants, JOHNSON & JOHNSON, INC., and DEPUY ORTHOPAEDICS, INC., and allege:

**NATURE OF THE ACTION**

1. This action arises from injuries sustained by ELIZABETH JOHNSON as the result of being implanted with a defective metal-on-metal DePuy Pinnacle Acetabular Cup System (hereinafter "Pinnacle System" or "Pinnacle Device" or "Device" or "Product") into Plaintiff's hip, which was designed, manufactured, marketed and sold by the Defendants.

2. Although the metal-on-metal Pinnacle System has not been recalled, there have been numerous adverse event reports regarding failure or complications and resulting injury associated with the Device.

3. If this action is removed to federal court, an immediate stay of local proceedings and a transfer of this to the MDL established in the U.S. District Court for the Northern District

Case: 2012 CA 005349 NC
Dkt: CPL

of Texas for Pinnacle metal-on-metal hip implant cases styled *In Re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation,* MDL No. 2244 would be appropriate since this case is a tag-along to that MDL.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action pursuant to 28 §1332 because Plaintiffs are residents of Florida, Defendants are residents of New Jersey and Indiana, and the amount in controversy exceeds the sum of $75,000.00

5. Venue is appropriate in this District pursuant to 28 U.S.C. §1391, as Defendants routinely do business in this District and a substantial part of the events giving rise to this claim occurred in this District.

**THE PARTIES**

6. At all times material to this cause, Plaintiffs were residents and citizens of Sarasota County, Florida.

7. At all relevant times, Defendant, DEPUY ORTHOPAEDICS, INC. (hereinafter "DePuy") was an Indiana corporation with its principal place of business at 700 Orthopaedic Drive, Warsaw, Kosciusko County, IN 46581, was registered to do business in the State of Florida, and was a subsidiary of Johnson & Johnson, Inc.

8. At all relevant times, Defendant, DePuy, designed, manufactured, tested, marketed, distributed and sold the metal-on-metal Pinnacle Device, either directly or indirectly, to consumers throughout the United States, including to the Plaintiff.

9. At all relevant times, Defendant, JOHNSON & JOHNSON ("J&J"), was a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, NJ 08933, and was a resident and citizen of New Jersey, and was the parent company of DePuy.

10. At all relevant times, Defendant, J&J, as the parent company of DePuy, designed, manufactured, tested, advertised, distributed and sold the metal-on-metal Pinnacle Device, either directly or indirectly, to consumers throughout the United States, including to the Plaintiff in Sarasota County, Florida.

**GENERAL ALLEGATIONS**

11. The Pinnacle Device was developed for the purpose of reconstructing diseased or fractured human hip joints. The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis. The hip joint is like a ball that fits into a socket. The socket portion of the hip is called the acetabulum. The femoral head at the top of the femur bone rotates within the curved surface of the acetabulum.

12. The metal-on-metal Pinnacle Device is made up of four components: the metal femoral stem is inserted inside the femur bone, the metal femoral head (or ball) connects to the top of the stem and then makes contact with a liner, which is inserted into the interior portion of the metal acetabulum cup (socket). The acetabulum cup is comprised of titanium metal on its outer shell, and either a plastic, ceramic, or cobalt-chromium metal liner within the plastic, ceramic, or metal liner. The cobalt-chromium metal liner is branded by Defendants as the "Ultamet" liner. A Pinnacle Device whose components include an Ultamet liner and a metal

femoral head is known as a "metal-on-metal" system due to the fact that both articulating surfaces – the acetabular (socket) liner and femoral head (ball) – are comprised of cobalt-chromium metal.

13. In 1976, the Medical Devices Amendment was passed, pursuant to which the FDA classified medical devices into three categories. A Class I device poses almost no safety issues. A Class II category device poses moderate safety issues. A Class III device operates to sustain human life, is of substantial importance in preventing impairment of human health, or poses potentially unreasonable risk of harm to patients.

14. Generally, Class III devices must undergo a Pre-Market Approval (PMA) process in order to be approved for marketing in the United States. Pre-Market Approval is a rigorous process that requires a manufacturer to submit what is typically a multi-volume application that includes, among other things, extensive clinical data to support the device's safety and effectiveness; a full statement of the device's components, ingredients, and properties, and principles of operation; a full description of the methods used in, and the facilities and controls used for the design, manufacture, processing, and, when relevant, packing and installation of such devices: samples of device components required by the FDA; and a specimen of the proposed labeling. When undergoing Pre-Market Approval, a Class III device may not use an existing device as a predicate, but rather the safety and effectiveness of the device must be independently shown.

15. The FDA may grant Pre-Market Approval only if the Agency finds that there are reasonable assurances that the medical device is safe and effective, and the Agency must weigh

any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

16. The use of metal-on-metal hip joint replacement devices predates the Medical Device Amendments (MDA) of 1976. Metal-on-metal devices were formally classified into Class III on September 4, 1987. However, because these Class III devices predate the MDA and because the requirements for a PMA had not yet been established for them, metal-on-metal hip systems bypassed the rigorous scrutiny of the Pre-Market Approval Process. In other words, the devices are essentially "grandfathered in" and cleared for marketing merely by demonstrating "substantial equivalence" to other "predicate" metal-on-metal hip implant systems already on the market. This is the Pre-Market Notification or "510(k) process" by which a Class II or less risky device is cleared for marketing.

17. The metal-on-metal Pinnacle Device is a Class III medical device; however, it received clearance from the FDA through the 510(k) process generally reserved for Class II devices, which only requires a showing of substantial equivalence to a device already on the market. In obtaining clearance for marketing of the Pinnacle Device, DePuy bypassed the Pre-Market Approval process altogether.

18. DePuy Orthopaedics applied for clearance of its first Ultima Metal-on-Metal Acetabular Cup (with liner) (K001523) on May 16, 2000, based upon its substantial equivalence to four devices: ZTT II Acetabular Cup System (metal on plastic); Sulzer Orthopedics Inter-Op Metasul Acetabular System (metal/plastic liner on metal); and two first-generation metal-on-

metal hip systems, the McKee-Farrar and the Ring. Clearance by the FDA for this device was received on August 18, 2000.

19. In fact, the McKee-Farrar metal-on-metal Hip and the Ring metal-on-metal hip date back to the 1960s but were eventually abandoned after tests found that patients had metal particles in their organs or blood, raising concerns about long-term health risks. In DePuy's product materials dated 2001, which promoted the Ultamet metal liner (used with the Pinnacle acetabular shell), DePuy explained that clinical issues limited the success of the McKee-Farrar and Ring Systems due to poor implant design, a limited understanding of design technology, and inadequate manufacturing processes.

20. On September 15, 2000, DePuy Orthopedics applied for clearance of the first Pinnacle Metal-on-Metal Acetabular Cup Liner (K002883) based upon its substantial equivalence to the DePuy Ultima metal liner that had just been cleared on August 10, 2000 – only 36 days earlier. The Pinnacle pre-market notification contained neither any post-market Ultima performance data nor any clinical data, asserting only that the Pinnacle metal liner was the same as the Ultima metal liner except for design changes that allowed the liner to be used with Pinnacle acetabular shells. Clearance by the FDA for this metal-on-metal liner was received on October 13, 2000. No subsequent metal Pinnacle liner notification has contained any results from clinical trials.

21. In 2001, DePuy published a brochure entitled "Ultamet, Metal-on-Metal Articulation," which is designed to be used with the Pinnacle Acetabular Cup System. In that brochure, DePuy admitted that the McKee-Farrar, Muller, and Ring prostheses, *which were the*

*very devices upon which it predicated its metal-on-metal Pinnacle system* ***were poorly designed and inadequately manufactured.***

22. Nonetheless, DePuy marketed the metal-on-metal Pinnacle Devices as having significant advantages over other first-generation hip devices, and touted the Pinnacle Device as having "superior clinical performance."

23. In 1996, Jonathan Black, Ph.D., an industry consultant and Clemson professor emeritus of bioengineering who specialized in production and biological sequelae of wear debris, warned in a medical journal article that metal-on-metal designs posed significant risks because little was known about the biological havoc that metallic debris might cause. Dr. Black also argued that, given the high success rate of existing designs, it would be statistically impossible to run enough studies to prove the new implants' supposed superiority.

24. In its July 2005 issue, *The Journal of Bone and Joint Surgery* published the results of a study that retrospectively analyzed 165 patients (with 169. hip implants) who had undergone primary cementless total hip replacements with a contemporary metal-on-metal total hip design between 2000 and 2002. The findings of the study raised the fear that early osteolysis in patients with this second-generation metal-on-metal hip replacement is associated with abnormalities consistent with delayed-type hypersensitivity reactions to metal.

25. Had Defendants heeded Dr. Black's warning and the warnings published thereafter, and closely monitored the performance of second generation metal-on-metal systems and the post-market experience of the metal-on-metal Pinnacle Device, they would have discovered that the Pinnacle Device results in a high percentage of patients developing

metallosis, biologic toxicity, and early and excessive failure rates due to the release of metal particles in the patients' surrounding tissue when the cobalt-chromium metal femoral head rotates within the cobalt-chromium metal acetabular liner.

26. In other words, implantation of the metal-on-metal Pinnacle Device results in the near-immediate systemic release of high levels of toxic metal cobalt-chromium ions into every hip implant patient's tissue and bloodstream. This is because cobalt-chromium metal particles are released by friction from the metal femoral head rotating within the metal liner. The particles then accumulate in the patient's tissue surrounding the implant giving rise to metallosis, pseudotumors, systemic toxic reactions, or other conditions.

27. The development of metallosis, pseudotumors, infection, and inflammation causes severe pain and discomfort, death of surrounding tissue, bone loss, and lack of mobility. These conditions make revision surgery exponentially more difficult to perform and increase the likelihood of failure of future implant surgeries.

28. As of 2011, approximately 1,086 adverse event reports have been submitted to the U.S. Food and Drug Administration (FDA) regarding failures or complications of the metal-on-metal Pinnacle Devices.

29. At all relevant times, Defendants were aware that metal-on-metal Pinnacle Devices posed an unreasonably high risk of developing metallosis, biologic toxicity, and total hip failure, and Defendants were aware that the Pinnacle Devices resulted in the unsafe release of toxic metal ions into the tissues and bloodstream of the hip implant recipients, such as Plaintiff herein.

30. A number of governmental regulatory agencies have recognized the problems caused by metal-on-metal implants such as the Pinnacle Device. For instance, Great Britain's Medicines and Healthcare Products Regulatory Agency ("MHRA") investigated Defendants' metal-on-metal total hip replacement system after receiving widespread reports of soft tissue reactions and tumor growth in thousands of patients who had received these implants. In April of 2010, MHRA issued a Medical Device Alert that required physicians to establish a system to closely monitor patients known to have metal-on-metal hips by monitoring the cobalt and chromium ion levels in their blood and to evaluate these vulnerable patients for related soft tissue reactions.

31. Similarly, on May 28, 2010, the Alaska Department of Health issued a bulletin warning of the toxicity of Defendants' metal-on-metal total hip replacement systems. The State of Alaska, like the MHRA, identified the need for close medical monitoring, surveillance, and treatment of all patients who had received the Pinnacle Devices and similar metal-on-metal implants.

32. Despite these warnings from regulators and medical device safety advocates, Defendants continue to misrepresent the metal-on-metal Pinnacle System as a high-quality, safe and effective hip replacement product in their marketing and promotional materials directed to physicians and patients, such as Plaintiff herein. This is despite the fact that Defendants have known for years that the Pinnacle Device poses an unreasonable danger to patients who have the Pinnacle Device implanted in their bodies and that the risks of implantation of the Pinnacle Device outweigh the benefits to the patient, including Plaintiff herein.

33. Defendants continue to sell the Pinnacle Device to doctors who implant them in countless numbers of patients with an unreasonably high percentage of those patients suffering serious injury from metallosis, pseudotumors, biologic toxicity, and other complications, including Plaintiff herein. Patients such as Plaintiff herein are reporting severe pain and the need for one or more complicated revision surgeries, resulting in life-long health problems caused by the defective Pinnacle Device.

## FEDERAL REQUIREMENTS

34. Pursuant to federal law, a device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packaging, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. §351.

35. Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular manner, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. §352.

36. Pursuant to federal regulation, manufacturers must comply with specific quality system requirements promulgated by the FDA. These regulations require manufacturers to meet design control requirements, including but not limited to, conducting design validation to ensure that devices conform to defined user needs and intended uses. Manufacturers must also meet quality standards in manufacturer and production. Manufacturers must establish and maintain procedures for implementing corrective actions and preventative actions, and they must

investigate the cause of non-conforming products and take corrective action to prevent recurrence. Manufacturers are also required to review and evaluate all complaints and determine whether ran investigation is necessary and are required to use statistical techniques (when necessary) to evaluate product performance. *See* 21 CFR §820.

37. The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR §820 *et seq.* as explained in the Federal Register, because Current Good Manufacturing Practice (CGMP) regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a particular device. Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the particular devices designed and manufactured and the manufacturing processes employed. Manufacturers must adopt current and effective methods and procedures for each device they design, and the manufacturer must comply with and implement the basic requirements set forth in the quality system regulations.

38. Pursuant to 21 CFR §820.1(c), the failure to comply with any of these provisions in Part 820 renders a device adulterated under section 501(h) of the Federal Food, Drug & Cosmetic Act ("the Act")(21 U.S.C. 351).

39. Defendants' metal-on-metal Pinnacle Device is adulterated pursuant to 21 U.S.C. §351 because, among other things, it failed to meet established performance standards, in that it caused severe injuries to recipients of the Device, such as Plaintiff herein, including metallosis,

pseudotumors, osteomyelitis and other conditions, which often require premature, painful revision surgery and render future revision surgeries less likely to be successful.

40. In addition, Defendants' metal-on-metal Pinnacle Device is misbranded because, among other things, it causes severe injuries to the recipients of the Device when used in the manner prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. §352.

**PLAINTIFF'S PINNACLE IMPLANT**

41. On or about June 2, 2009, Plaintiff underwent a left total hip replacement, which included a DePuy Pinnacle acetabular cup, Reference #1217-30-052, Lot DS9BP1000; Articul/Eze M Metal on Metal femoral head, Reference #1365-51-000, Lot number 2775074; and a Pinnacle metal insert, Reference #1218-87-352, Lot number 2809255. The procedure was performed at Venice Regional Medical Center in Venice, Florida.

42. Following surgery, Plaintiff's wounds healed without infection, and x-rays showed the hip placement to be properly positioned and the hip replacement suffered no impact or trauma.

43. Despite these optimal conditions for a successful hip replacement, in approximately September of 2010, Plaintiff began to experience residual discomfort radiating from her left hip through her thigh; however, x-rays failed to show loosening and there appeared to be no infection at the surgical site. By December of 2010, Plaintiff's discomfort had worsened and became extremely painful and deliberating. Plaintiff began walking with a limp and experiencing severe left hip and leg pain, decreased range of motion, and spontaneous onset of pain shooting down her leg, groin, and buttocks. X-rays demonstrated evidence of radiolucency

around the acetabulum cup. She was treated for subtrochanteric bursitis with steroids and injections. In July of 2011, blood tests showed high levels of cobalt and chromium in her bloodstream.

44. After many months of suffering debilitating pain in her left hip, Plaintiff was advised by her physician that the Pinnacle Device in her left hip had failed, and that she needed to undergo left hip revision surgery.

45. On or about August 9, 2011, Plaintiff underwent revision surgery on her left hip at Venice Regional Medical Center in Venice, Florida, performed by Dr. John P. Vidolin. Subsequently, she suffered numerous complications as a result of this revision surgery, and underwent additional surgery on November 8, 2011, at Tampa General Hospital by Dr. Thomas Bernasek of Florida Orthopedic Institute.

46. As a direct and proximate result of Defendants placing the defective Pinnacle Device into the stream of commerce, Plaintiff has suffered, and continues to suffer, injuries and damages within Sarasota County, Florida, including but not limited to, past, present and future physical and mental pain and suffering; past, present and future hospital and medical expenses, rehabilitative and pharmaceutical expenses; loss of earnings and the capacity to earn a living; and loss of quality of life. These injuries and damages are continuing.

**COUNT I -**
**STRICT LIABILITY – DEFECT IN DESIGN**

47. Plaintiff incorporates and realleges the General Allegations in paragraphs 1 through 46 above as if fully set forth herein.

48. This is an action for strict liability based upon a design defect against all Defendants herein.

49. At all times material hereto, Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, labeling, distributing, marketing, selling, and/or distributing the DePuy Pinnacle Acetabular Cup System (the Pinnacle Device).

50. The Pinnacle Device was intended for use in hip replacement procedures for consumers, and Plaintiff herein was a consumer and relied upon the manufacturing safety of the device.

51. Defendants had a duty to place into the stream of commerce and to manufacture, distribute, market, retail, promote and sell the Pinnacle Device in a manner that it was not defective and unreasonably dangerous when put to the uses for which it was designed, manufactured, distributed, marketed and sold.

52. At all relevant times, Defendants expected the Pinnacle Device to reach, and it did reach consumers in the State of Florida, including Plaintiff, without substantial change in the condition in which it was sold.

53. The Pinnacle Device was defectively designed, manufactured, and/or tested so as to be unreasonably dangerous to consumers, including Plaintiff herein, at the time it was placed into the stream of commerce, in that:

a) The Pinnacle Device contained unreasonably dangerous design and manufacturing defects;

b) The Pinnacle Device was not reasonably safe when used as intended, subjecting patients, including Plaintiff herein, to an unreasonably high risk of

failure of the total hip replacement, the necessity of further invasive surgery, and a reduced likelihood of having successful hip implant procedures in the future;

c) The Pinnacle Device created an unreasonably high risk of premature failure, bone loss, heavy metal poisoning, tissue toxicity, and the need for revision surgery, which outweighs the benefits of the Pinnacle Device to patients, including Plaintiff herein;

d) The Pinnacle Device was more dangerous than an ordinary consumer would expect and more dangerous than other similar prosthetic hip components that were already on the market;

e) The Pinnacle Device is designed in such a way that it is difficult (if not impossible) to install properly;

f) The Pinnacle Device is designed in such a way that it leaves users of the Pinnacle Device vulnerable to metal poisoning, tissue necrosis, bone loss, and premature failure of the implant, necessitating surgery and replacement of the implant and long-term risks of recurrent implant failures;

g) The Pinnacle Device did not perform as safety as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants;

h) The Pinnacle Device failed to comply with federal requirements and parallel state law requirements relating to misbranded and adulterated products.

54. The Pinnacle Device that was implanted into the Plaintiff had not been materially altered or modified prior to the implantation of the devices.

55. Plaintiff was a foreseeable user of the device and the device was implanted into Plaintiff for its intended purpose, a total hip replacement.

56. Had the Pinnacle Device not been defective, Plaintiff would not have sustained the injuries alleged herein.

57. Plaintiff could not have discovered any defect in the Pinnacle Device through the exercise of due care.

58. Defendants as designers, manufacturers, marketers, detailers, distributors, and retailers of medical devices are held to the level of knowledge of experts in their field.

59. Plaintiff and the implanting surgeon did not have substantially the same knowledge as the Defendants.

60. The design defect in the Pinnacle Device caused serious damage to Plaintiff herein, including bodily injury, pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a pre-existing condition, loss of the capacity for the enjoyment of life, the costs of medical care and expenses, loss of earnings, and loss of earning capacity. These injuries and damages will continue into the future.

WHEREFORE, Plaintiff demands judgment against each and every Defendant herein in an amount in excess of $75,000.00, together with the costs of this action, post-judgment interest, and such other relief as the Court deems just. Plaintiff further demands trial by jury.

**COUNT II**
**STRICT LIABILITY – MANUFACTURING DEFECT**

61. Plaintiff realleges and incorporates the General Allegations contained in Paragraphs 1 through 46 as if fully set forth herein.

62. This is an action for strict liability based on a manufacturing defect against all Defendants herein.

63. The Pinnacle Device is designed to rigorous specifications. The product's performance, durability, integrity, safety, and longevity depend on the product being manufactured such that it meets those very strict design criteria.

64. The Pinnacle Device was frequently not manufactured according to design specifications by Defendants herein, and, therefore, failed at an unacceptable rate causing poor fit, premature wear, mal-alignment, metal failure, metal debris, tissue necrosis, heavy metal poisoning, bone loss, and the need for premature explant in patients such as Plaintiff herein.

65. The Pinnacle Device that was manufactured, designed, marketed, distributed, sold and/or placed in the stream of commerce by the Defendants was defective in its manufacture and construction in that, when it left the hands of the Defendants, it deviated from product specifications and/or applicable federal requirements for such medical devices, posing a serious risk of injury to the consumer into whom it was implanted, including Plaintiff herein. Plaintiff was a foreseeable user of the device and the device was implanted into Plaintiff for its intended purpose, i.e. a total hip replacement.

66. Had the Pinnacle Device not been defectively manufactured, Plaintiff would not have sustained the injuries alleged herein.

67. As a result of the manufacturing defects in Defendants' Pinnacle Device, Plaintiff suffered metallosis, tissue necrosis, heavy metal poisoning, loss of bone, premature failure of the hip implant, severe pain and disability, and the emergent need for explanation and replacement of the hip implant.

68. The manufacturing defects in the Pinnacle Device caused serious damage to Plaintiff herein, including bodily injury, pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a pre-existing condition, loss of the capacity for the enjoyment of life, the costs of medical care and expenses, loss of earnings, and loss of earning capacity. These injuries and damages will continue into the future.

69. As a further proximate result of the manufacturing defects in the Pinnacle Device, Plaintiff suffered debilitating physical pain and mental suffering, was required to undergo additional hip surgeries, incurred substantial hospital, medical, nursing and rehabilitative expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of wages and loss of earning capacity; and loss of quality of life, and all of these injuries are permanent and continuing.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

**COUNT III**
**STRICT LIABILITY – FAILURE TO WARN**

70. Plaintiff realleges and incorporates the General Allegations contained in Paragraphs 1 through 46 as if fully set forth herein.

71. At all relevant times, Defendants manufactured, designed, tested, distributed and/or sold the Pinnacle Device that was implanted into Plaintiff herein.

72. The Pinnacle Device that was implanted into Plaintiff herein was defective and unreasonably dangerous when the Pinnacle Device left the possession of the Defendants in that the Pinnacle Device contained inadequate warnings of the following:

a) The Pinnacle Device posed an unreasonably high risk of failure once implanted;

b) The Pinnacle Device could not be consistently implanted with satisfactory alignment by skilled surgeons;

c) The consequences of mal-alignment in patients such as Plaintiff herein;

d) The potential for premature wear, heavy metal poisoning, tissue necrosis, excessive metal debris, and bone loss in patients, including Plaintiff herein;

e) The excessively high rate of premature failure and/or loosening of the Pinnacle Device;

f) That the Pinnacle Device, when compared with other hip implant products, has an excessive failure and revision rate and poses greater risks to the patient than other products;

g) The promotional materials, labeling and instructional materials that accompanied the Pinnacle Device were inadequate and misleading to consumers and their implanting surgeons;

h) That even after Defendants received notice from reputable medical sources (prior to the sale of the device to the Plaintiff) that the devices presented an inordinately high risk of failure and harm to the consumer, Defendants knowingly and deliberately failed to warn the public, including Plaintiff and Plaintiff's implanting surgeon, of the serious risk of injury and failure occasioned by the defects in the Pinnacle Device;

i) The Pinnacle Device did not conform to the representations made by Defendants concerning the product; and

j) Defendants' representations concerning the Pinnacle System did not conform to applicable federal requirements.

73. Defendants, as manufacturers of the Pinnacle Device, are held to the level of knowledge of experts in the field of that type of prosthetic device, and had a duty to warn their consumers and prescribing physicians of the dangers associated with the Pinnacle Device and failed to do so.

74. The warnings that accompanied Defendants' Pinnacle Device failed to provide that level of information that an ordinary consumer would expect when using the product in a manner reasonably foreseeable to Defendants.

75. Had Plaintiff or Plaintiff's surgeon received a proper or adequate warning as to the risks associated with use of the Pinnacle Device from Defendants, Plaintiff would not have been implanted with Defendants' Pinnacle Device.

76. At the time Plaintiff's surgeon implanted the Pinnacle Device, the surgeon did not have substantially the same knowledge as the Defendants about the unreasonably high risks of failure of the Pinnacle Device because Defendants failed to provide adequate warnings of those risks to Plaintiff and Plaintiff's surgeon.

77. As a result of Defendants' failure of warn of defects with the Pinnacle Device, Plaintiff suffered metallosis, tissue necrosis, heavy metal poisoning, loss of bone, premature failure of the implant, severe pain and disability, and the emergent need for explanation and replacement of the hip implant.

78. Defendants' failure to warn of defects in the Pinnacle Device caused serious damage to Plaintiff herein, including bodily injury, pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a pre-existing

condition, loss of the capacity for the enjoyment of life, the costs of medical care and expenses, loss of earnings, and loss of earning capacity. These injuries and damages will continue into the future.

79. As a further proximate result of Defendants' failure to warn of defects in the Pinnacle Device, Plaintiff suffered debilitating physical pain and mental suffering, was required to undergo additional hip surgeries, incurred substantial hospital, medical, nursing and rehabilitative expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of wages and loss of earning capacity; and loss of quality of life, and all of these injuries and damages are permanent and continuing.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

**COUNT IV**
**NEGLIGENCE**

80. Plaintiff incorporates and realleges Paragraphs 1 through 46 as though fully set forth herein.

81. This is an action for negligence against all Defendants.

82. At all times material hereto, Defendants, directly or indirectly, created, manufactured, assembled, designed, sterilized, tested, packaged, labeled, marketed, promoted, advertised, sold and/or distributed the Pinnacle Device, including the Pinnacle Device that was implanted into Plaintiff herein.

83. At all relevant times, Defendants owed a duty to the public and to Plaintiff herein to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, testing, labeling, assembling, packaging, distribution, promotion, sale, and post-marketing surveillance of the Pinnacle Device to insure that the Pinnacle Device would be safe for its intended use.

84. Defendants were negligent in the designing, testing, manufacturing, distributing, marketing, promoting, retailing, and selling of the Pinnacle Device and breached Defendants' duty to Plaintiff herein, in part, in the following manner:

a) Defendants designed, manufactured and sold a Pinnacle Device that they knew or should have known created an unreasonably high risk of failure when implanted into patients, including Plaintiff herein;

b) Defendants failed and/or refused to include adequate warnings with the Pinnacle Device that would alert Plaintiff and/or Plaintiff's surgeon to the potential risks and serious side effects of the Pinnacle Device;

c) Defendants failed and/or refused to adequately and properly test the Pinnacle Device before placing the device on the market and into the stream of commerce;

d) Defendants failed to conduct significant testing on the Pinnacle Device, both before and after the device was placed on the market, which, if properly performed, would have shown that the Pinnacle Device caused serious side effects, including, but not limited to, severe pain and disability, metallosis, synovitis, bone loss, tissue necrosis, premature device failure, and the need for revision surgery;

e) Defendants failed to adequately warn the Plaintiff and/or Plaintiff's surgeon that the Pinnacle Device caused or was associated with an unreasonably high risk of failure and painful and debilitating side effects, including increased metal-on-metal wear between the femoral and acetabular component, increased metallic corrosion, difficulty faced by skilled surgeons in installing the implant, inadequate surgical instructions, and other defects;

f) Defendants failed to warn, or adequately warn the Plaintiff or Plaintiff's prescribing physician that the device created a higher risk of failure than other similar devices currently on the market;

g) Defendants failed to provide adequate post-marketing warnings or instructions to the Plaintiff and/or Plaintiff's surgeon of the significant risk of injury and failure of the total hip replacement associated with the device;

h) Defendants placed an unsafe and defective hip prosthetic device into the stream of commerce;

i) Defendants failed to conform to the applicable federal laws and regulations in designing, manufacturing, marketing, selling and distributing the device; and

j) Defendants underplayed the significant risks of failure of the Pinnacle Device to the public, including Plaintiff herein and/or Plaintiff's surgeon, in order to make a profit from sale of the Pinnacle Device.

85. Defendants knew or should have known that Pinnacle Device caused unreasonably dangerous risks and serious side effects of which the Plaintiff and/or Plaintiff's surgeon would not be aware, but nevertheless advertised, marketed, sold and distributed the Pinnacle Device knowing that there were safer comparable products for hip replacements.

86. As a result of the Defendants' negligence with regard to the Pinnacle Device, Plaintiff suffered metallosis, tissue necrosis, heavy metal poisoning, loss of bone, premature failure of the implant, severe pain and disability, and the emergent need for explanation and replacement of the hip implant.

87. Defendants' negligence with regard to the Pinnacle Device caused serious damage to Plaintiff herein, including bodily injury, pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a pre-existing condition, loss of

the capacity for the enjoyment of life, the costs of medical care and expenses, loss of earnings, and loss of earning capacity. These injuries and damages will continue into the future.

88. As a further proximate result of Defendants' negligence, Plaintiff suffered debilitating physical pain and mental suffering, was required to undergo additional hip surgeries, incurred substantial hospital, medical, nursing and rehabilitative expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of wages and loss of earning capacity; and loss of quality of life, and all of these injuries and damages are permanent and continuing.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

## COUNT V
## NEGLIGENT MISREPRESENTATION

89. Plaintiff incorporates and realleges Paragraphs 1 through 46 as if fully set forth herein.

90. At all relevant times, Defendants knew or should have known that the Pinnacle Device that was implanted into Plaintiff herein was defective and failed to comply with federal requirements for safe design and manufacture and/or was in other ways out of specification. Yet, Defendants negligently misrepresented to the Plaintiff and/or Plaintiff's surgeon that the Pinnacle Device was safe and met all applicable design and manufacturing requirements.

91. Plaintiff and/or Plaintiff's surgeon reasonably relied upon Defendants' misrepresentations and omissions concerning the safety of the Pinnacle Device to Plaintiff's detriment.

92. As the direct result of Defendants' negligent misrepresentations and omissions and/or failure to disclose its violations of federal requirements applicable to its Pinnacle Device, Plaintiff was implanted with a Pinnacle Device and suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

**COUNT VI**
**FRAUDULENT MISREPRESENTATION**

93. Plaintiff incorporates and realleges Paragraphs 1 through 46 as if fully set forth herein.

94. Plaintiff was implanted with a Pinnacle Device that was designed, manufactured, packaged, labeled, marketed, distributed and/or sold by Defendants.

95. At the time Plaintiff purchased and was implanted with the Pinnacle Device, Defendants had actual knowledge that the device was defective in that it created an unreasonably high risk of injury to the tissues surrounding the implant and created an unreasonably high risk of failure of the implant when implanted and used as directed.

96. Despite Defendants' actual knowledge of the unreasonably high risk of failure of the device and/or severe injury to the recipient of the device, and despite complaints and adverse event reports that Defendant received concerning defects in the Pinnace Device, Defendants acted with gross negligence and willful and wanton disregard of the safety of the general public and of the Plaintiff in knowingly and intentionally continuing to market, promote and sell the Pinnacle Device with no warning concerning the known high risk of failure and injury, so as to maximize their sales and profits at the expense of the health and safety of the public and of the Plaintiff herein.

97. Defendants' culpable fraudulent misrepresentations to the public and to Plaintiff include, but are not limited to:

a) Failing or refusing to conduct adequate pre-marketing and post-marketing testing of the device and surveillance of implanted patients;

b) Failing or refusing to conduct adequate testing of the device even after having received numerous adverse event reports and complaints that the Pinnacle Device had a high risk of failure and a high risk of causing severe side effects when implanted and used as directed;

c) Failing or refusing to warn consumers and their surgeons, including Plaintiff herein, that the Pinnacle Device had a high risk of failure and of causing serious injury;

d) Intentionally omitting any mention on the advertisements and labeling that use of the Pinnacle Device had been associated with an unreasonably high risk of component loosening, component malalignment, infection, metallosis, bone fracture, bone loss, pseudotumor formation, dislocation and pain, despite the fact that Defendants were made aware of adverse event reports and complaints long before Plaintiff herein was implanted with the device;

e) Intentionally failing and refusing to change the label of the Pinnacle Device to reflect the high risk of failure of the devices and injury to its recipient due to its defective condition;

f) Engaging in a promotional campaign for the Pinnacle Device that minimized the high risk of serious injuries and the need for revision surgery caused by the Pinnacle Device, and embarking on a campaign that discounted and diminished reports of excessive and/or premature failure of the Pinnacle Device resulting in injuries to implanted patients; and

g) Falsely and fraudulently representing to the medical community, patients, the general public, the FDA, and/or Plaintiff that the Pinnacle Device had been tested and were found to be safe and/or effective as a hip replacement system.

98. All of the above misrepresentations, omissions, and/or concealments of the Defendants were intentional acts specifically directed to keep safety concerns about the Pinnacle Devices from reaching patients, including Plaintiff herein, as well as surgeons and others and in order to prevent such safety concerns and information about defects in the Pinnacle Device from decreasing Defendants' sales of the Pinnacle Devices.

99. Such misrepresentations, omissions, and/or concealments by Defendants were undertaken with the intent that Plaintiff herein and others would rely upon them.

100. Defendants' misrepresentations, omissions, and/or concealments were undertaken with the intent of defrauding and deceiving Plaintiff, Plaintiff's surgeon, the medical community, and other consumers and were committed in an effort to induce and encourage the sale of the Pinnacle Device.

101. If the representations and warnings concerning the Pinnacle Devices had been accurate and truthful, such representations and warnings would have dissuaded Plaintiff herein and/or Plaintiff's surgeon from purchasing or using the device, and Plaintiff would not have used

the Pinnace Device had Plaintiff known that the Pinnacle Device would cause Plaintiff to suffer subsequent pain and disability, require Plaintiff to under additional revision surgeries, and suffer other injuries due to the defective condition of the Pinnacle Device.

102. Plaintiff relied upon and was induced by Defendants' misrepresentations, omissions and/or active concealment of the dangers and risks associated with use of the Pinnacle Device to Plaintiff's detriment.

103. The aforementioned actions of Defendants constituted knowing and intentional misconduct and/or conduct undertaken with reckless, willful and wanton disregard for the safety of the public and of Plaintiff herein, and such conduct was, at all times material, ratified by the Defendants.

104. As a result of Defendants' misrepresentations, omissions, and/or active concealment of the dangers and risks associated with the Pinnacle Device, Plaintiff suffered metallosis, tissue necrosis, heavy metal poisoning, loss of bone, premature failure of the implant, severe pain and disability, and the emergent need for explanation and replacement of the hip implant.

105. Defendants' misrepresentations, omissions, and/or active concealment of the dangers and risks associated with the Pinnacle Device caused serious damage to Plaintiff herein, including bodily injury, pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a pre-existing condition, loss of the capacity for the enjoyment of life, the costs of medical care and expenses, loss of earnings, and loss of earning capacity. These injuries and damages will continue into the future.

106. As a further proximate result of Defendants' misrepresentations, omissions, and/or active concealment of the dangers and risks associated with the Pinnacle Device, Plaintiff suffered debilitating physical pain and mental suffering, was required to undergo additional hip surgeries, incurred substantial hospital, medical, nursing and rehabilitative expenses therefrom; suffered emotional distress, anxiety, depression and disability; loss of wages and loss of earning capacity; and loss of quality of life, and all of these injuries and damages are permanent and continuing.

WHEREFORE, Plaintiff demands judgment against Defendants for damages, as well as all costs of this action and a trial by jury of all issues to be tried.

**COUNT VII**
**(BREACH OF POST-SALE DUTY TO WARN)**

107. Plaintiff incorporates by reference paragraphs 1 through 46 of this Complaint as if fully set forth herein.

108. This is an action against all Defendants for the negligent failure to issue a timely post-sale warning to the public and Plaintiff herein regarding the risks associated with the Pinnacle Device.

109. Defendants had a duty to warn the public in a timely fashion when Defendants knew or should have known of the risks and/or defects associated with the Pinnacle Device.

110. Defendants' duty to warn with respect to Plaintiff herein extended beyond the date when Plaintiff was implanted with the Pinnacle Device.

111. Defendants knew or should have known of the risks and defects associated with the Pinnacle Device before the Pinnacle Device began to cause harm and injury to Plaintiff herein.

112. Had Plaintiff received a proper or adequate post-sale warning aw to the risks associated with use of the Pinnacle Device, Plaintiff could have had the Pinnacle Device removed sooner, which would have lessened Plaintiff's pain and suffering and prevented Plaintiff from suffering further damage and injury due to defects and risks of the Pinnacle Device.

113. The failure to issue a timely post-sale warning of the Pinnacle Device's risks caused serious damage to Plaintiff herein, including bodily injury, pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, aggravation of a pre-existing condition, loss of the capacity for the enjoyment of life, the costs of medical care and expenses, loss of earnings, and loss of earning capacity. These injuries and damages will continue into the future.

WHEREFORE, Plaintiff demands judgment against Defendants herein in an amount in excess of $75,000.00, together with the costs of this action, post-judgment interest, and such other relief as the Court deems just. Plaintiff further demands trial by jury.

## COUNT VIII
## BREACH OF EXPRESS WARRANTY

114. Plaintiff incorporates by reference paragraphs 1 through 46 of this Complaint as if fully set forth herein.

115. This is an action against Defendants for breach of express warranty.

116. Defendants knew of the use for which the Pinnacle Device was intended and expressly warranted that the Pinnacle Device would be of merchantable quality and be safe and fit for its intended use.

117. Defendants acted in such a way that it extended an express warranty to Plaintiff, warranting that the Pinnacle Device would be free of defects and would be merchantable and/or fit for the purpose for which the implants were sold, and would be safe and fit for their intended use.

118. Plaintiff reasonably and justifiably relied upon these implied warranties.

119. Defendants' actions occurred as part of the sale of the Pinnacle Device which created privity between Plaintiff and Defendants herein.

120. Plaintiff reasonably relied on the skill and judgment of Defendants as to whether the Pinnacle Device was of merchantable quality and safe and fit for its intended use.

121. Contrary to such express warranty, the Pinnacle Device implanted in Plaintiff herein was not of merchantable quality and was not safe or fit for its intended use, as it was unreasonably dangerous and unfit for the ordinary purpose for which it was intended.

122. The breach of the express warranties by Defendants was a direct and proximate cause of serious and permanent injuries suffered by Plaintiff herein.

123. As a direct and proximate result of the breach of express warranties by Defendants, Defendants are directly and/or vicariously liable to Plaintiff for all damages allowable under applicable law.

124. As a direct and proximate result of the breach of express warranties by Defendants, Plaintiff was injured and has experienced pain and suffering, physical and mental handicaps, physical and mental disability, scarring, disfigurement, aggravation of pre-existing injuries and conditions, mental anguish, inconvenience, embarrassment, and loss of capacity for the enjoyment of life. These injuries and damages are permanent and/or are continuing in nature.

125. As a further direct and proximate result of the breach of express warranties by Defendants, Plaintiff has incurred economic damages including medical and nursing expenses, lost wages, loss of earning capacity, and other damages in the past and will continue to incur such damages and economic losses in the future. These losses are permanent and/or are continuing in nature.

WHEREFORE, Plaintiff demands judgment against Defendants herein in an amount in excess of $75,000.00, together with the costs of this action, post-judgment interest, and such other relief as the Court deems just. Plaintiff further demands trial by jury.

**COUNT IX**
**BREACH OF IMPLIED WARRANTY**

126. Plaintiff incorporates by reference paragraphs 1 through 46 of this Complaint as if fully set forth here and further allege as follows:

127. This is an action against all Defendants for breach of implied warranty.

128. Defendants knew of the use for which the Pinnacle Device was intended and impliedly warranted the Pinnacle Device would be of merchantable quality and be safe and fit for its intended use.

129. Defendants acted in such a way that it extended an implied warranty to Plaintiff warranting that the Pinnacle Device would be free of defects and would be merchantable and/or fit for the purpose for which they were sold, and would be safe and fit for their intended use. Plaintiff reasonably and justifiably relied upon these implied warranties.

130. Defendants' actions occurred as part of the sale of the Pinnacle Device which created privity between Plaintiff and Defendants.

131. Plaintiff reasonably relied on the skill and judgment of Defendants as to whether the Pinnacle Device was of merchantable quality and safe and fit for its intended use.

132. Contrary to such implied warranty, the Pinnacle Device at issue in this lawsuit was not of merchantable quality and was not safe or fit for its intended use, as it was unreasonably dangerous and unfit for the ordinary purpose for which it was intended.

133. The breach of the implied warranties by Defendants was a direct and proximate cause of serious and permanent injuries suffered by Plaintiff herein.

134. As a direct and proximate result of the breach of implied warranties by Defendants, Defendants are directly and/or vicariously liable to Plaintiff for all damages allowable under applicable state law.

135. As a direct and proximate result of the breach of implied warranties by Defendants, Plaintiff was injured and has experienced pain and suffering, physical and mental handicaps, physical and mental disability, scarring, disfigurement, aggravation of pre-existing injuries and conditions, mental anguish, inconvenience, embarrassment, and the loss of capacity for the enjoyment of life. These injuries are permanent and/or are continuing in nature.

136. As a further direct and proximate result of the breach of implied warranties by Defendants, Plaintiff has incurred economic damages including medical and nursing expenses, lost wages, loss of earning capacity, and other damages in the past and will continue to incur such damages and economic losses in the future. These losses are permanent and/or are continuing in nature.

WHEREFORE, Plaintiff, demands judgment against Defendants herein in an amount in excess of $75,000.00, together with the costs of this action, post-judgment interest, and such other relief as the Court deems just. Plaintiff further demands trial by jury.

**COUNT X -**
**CONSORTIUM CLAIM**

137. GORDY JOHNSON and ELIZABETH JOHNSON incorporate by reference paragraphs 1 through 46 of this Complaint as if fully set forth here and further allege as follows.

138. At all times relevant, GORDY JOHNSON and ELIZABETH JOHNSON were married.

139. As a result of the injuries and damages sustained by ELIZABETH JOHNSON, Plaintiff GORDY JOHNSON has been deprived of the services, comfort, society and attentions of ELIZABETH JOHNSON in the past, all of which damages and losses will continue in the future.

WHEREFORE, GORDY JOHNSON demands judgment against each and every Defendant herein in an amount in excess of $75,000, together with costs of this action, post-

judgment interest and such other relief as the Court deems just. Plaintiffs further demand trial by jury.

Dated this 26th day of June, 2012.

Brenda S. Fulmer
Florida Bar No.: 999891
C. Calvin Warriner, III
Florida Bar No.: 374131
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax:(561) 383-9498
Attorneys for Plaintiff